UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

In re:

MAXWELL S. PFEIFER and
MYRNA J. PFEIFER,

          Debtors.

Chapter 11

Case No. 12-13852 (ALG)

# MEMORANDUM OF DECISION

A P P E A R A N C E S:

RICH MICHAELSON MAGALIFF MOSER, LLP  
*Counsel for the Debtors*  
By:    Howard P. Magaliff  
340 Madison Avenue, 19th Floor  
New York, NY 10173

THE LAW OFFICES OF MICHAEL T. SUCHER  
*Counsel to Plaintiff Funding Holding, Inc.,*  
By:    Michael T. Sucher  
26 Court St., Suite 2412  
Brooklyn, New York 11242

ROSENBERG, MUSSO & WEINER, LLP  
*Counsel to the Official Committee of Unsecured Creditors*  
By:    Bruce Weiner  
26 Court St., Suite 2211  
Brooklyn, New York 11242

**ALLAN L. GROPPER**  
**UNITED STATES BANKRUPTCY JUDGE**

# INTRODUCTION

      Before the Court is the objection of creditor Plaintiff Funding Holding, Inc. ("Objectant") to the Debtors' Joint Amended Plan of Reorganization ("Plan"). Objectant argues that the Plan violates § 1129(a)(15) of the Bankruptcy Code in that the value of the property distributed to

unsecured creditors is less than the Debtors' projected disposable income. For the reasons set forth below, the Objection is overruled, and the Plan is confirmed.

## BACKGROUND

Maxwell and Myrna Pfeifer (collectively, the "Debtors") are individual chapter 11 debtors who filed for bankruptcy on September 9, 2012. For many years, Mr. Pfeifer had a thriving personal injury law practice; he claims he obtained so many large judgments that he became known in legal circles as "Million Dollar Max". *Amended Disclosure Statement* [ECF No. 158] ("*Disc. Statement*"), at 7. In the past years, however, as Mr. Pfeifer's health deteriorated, his income from his law practice decreased substantially. His operating statements show that as of August 31, 2013, his income from his law practice over the preceding 12 months was only $74,546. *Operating Statement for August 2013* [ECF No. 160]. In the eight months preceding their bankruptcy filing, the Debtors' reported only $5,887 in business income from Mr. Pfeifer's law practice. *Statement of Financial Affairs* [ECF No. 1]. Besides this income he currently receives social security, and Mrs. Pfeifer, a retired teacher, receives pension and social security income. *Disc. Statement*, at 8. At the same time as Mr. Pfeifer's income from his law practice decreased, the Debtors overextended themselves financially, causing them to borrow money from several sources, and leading ultimately to their bankruptcy filing. *Id.*

The Debtors filed their Joint Amended Chapter 11 Plan of Reorganization on July 23, 2013 [ECF No. 132]. The Plan contemplates selling several properties that the Debtors own in the Bronx, except for one apartment unit in which the Debtors reside and on which they will continue to make payments in accordance with the terms of the original loan documents. The sale proceeds from the other properties will be used to pay the Debtors' secured creditors, with any excess distributed in the manner described below. The Debtors also have one litigation claim

2

relating to an investment in a property in Florida; the Debtors current intention is to pay a $468,159 tax liability they anticipate from the sale of this property from the proceeds of any settlement or judgment they receive from this litigation (*Pfeifer v. Cronin, et. al.* 13-1348-ALG).

A key feature of the Plan is the creation of a post-confirmation trust ("Trust"), which is memorialized in a Post-Confirmation Trust Agreement [ECF No. 150]. The Trust will pay unsecured creditors pro rata from the proceeds of various assets. The assets transferred to the Trust include: (i) the Debtors' avoidance causes of action under the Bankruptcy Code; (ii) proceeds from the *Cronin* Adversary proceeding currently pending in this Court (after payment of attorney's fees, the anticipated tax liability, and $100,000 to the Debtors); (iii) the remainder of the proceeds from the sale of one of the Bronx properties after payment of a broker's commission, the secured creditor's claim, and $110,000 to the Debtors; (iv) a portion of the proceeds from the sale of four other Bronx properties after payment of a broker's commission, real estate taxes, and the secured creditors' claims; and (v) a portion of Mr. Pfeifer's referral fees relating to cases Mr. Pfeifer referred to other law firms in past years. *Dis. Statement*, Exh. 3. The Debtors estimate that if events transpire favorably, general unsecured creditors may receive up to 28.99% of the total value of their claims from the Trust; however, a recovery to unsecured creditors is not assured, and unsecured creditors will only receive their pro-rata distribution from the Trust "after the Post-Confirmation Trustee has reserved any Cash required to pay Claims that are senior in priority and the fees and expenses of the Post-Confirmation Trustee and his or her professionals, if any." *Plan*, at 12.

The Plan was overwhelmingly supported by creditors as every class entitled to vote voted affirmatively, including 93.1% of the general unsecured creditors representing 88.96% of the total amount of general unsecured claims. *Second Amended Certification of Voting and Ballot*

*Tabulation* [ECF No. 159]. Nevertheless, one unsecured creditor, the Objectant, objected to the Plan and opposed confirmation. The Official Committee of Unsecured Creditors ("Committee") supported the Plan and also filed a response to the Objection in which it noted that the Trust was "the result of negotiations between the Committee and the Debtors", and "[t]he Committee voted unanimously to support the plan. . . ." *Committee's Response* [ECF No. 163], at ¶ 3.

As noted above, the Objectant argued in opposition to the Plan that it failed to satisfy § 1129(a)(15) of the Code; there were no other unresolved objections. At the confirmation hearing, the Court took the matter under advisement, requesting additional briefing on the § 1129(a)(15) issue.

## DISCUSSION

In 2005, amendments to the Bankruptcy Code added to the numerous requirements for confirmation in a chapter 11 case the following:

> In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—
>
> > (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
> >
> > (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15); Pub.L. 109–8, 119 Stat. 23. The Debtors must comply with § 1129(a)(15) because the Objectant—an unsecured creditor in the Debtors' case—has filed an objection, and the Plan does not pay Objectant 100% of its allowed claim.

4

**The Mandate of § 1129(a)(15)**

The Objectant argues that the Debtors' Plan violates § 1129(a)(15)(B) because it does not distribute property to *unsecured creditors* in an amount equal to or greater than the Debtors' projected disposable income. *Objection*, at 5–6. Specifically, Objectant contends, (i) Mr. Pfeifer is capable of earning $300,000 per year from his law practice, as he did in 2010 and 2011 (quoting the Disclosure Statement as to his legal success); (ii) the Debtors do not include estimated payments they may receive from the Trust as projected disposable income; (iii) the Debtors must distribute their "disposable income" for the life of the trust, not merely five years; and (iv) the Debtors' liability for professional fees in this case should not be included as an expense in calculating the Debtors' projected disposable income. *Id.* at 14–19.

Objectant's position is based on a basic misconstruction of § 1129(a)(15), that an individual chapter 11 debtor must under the circumstances of a case like this pay unsecured creditors an amount equal to projected disposable income. As further discussed below, § 1129(a)(15) relies on and cross-references a chapter 13 provision, § 1325(b)(2), for its definition of "projected disposable income". Another subsection of § 1325, § 1325(b)(1)(B), does require a chapter 13 debtor to pay *all* of his or her projected disposable income to *unsecured creditors*.[1] Section 1129(a)(15)(B) contains no such requirement and provides only that "the value of the property to be distributed under the plan"—which would include property

---

[1] Section 1325(b)(1) provides that
>  If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>  (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>  (B) the plan provides that *all of the debtor's projected disposable income* to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make *payments to unsecured creditors* under the plan.

11 U.S.C. § 1325(b)(1) (emphasis added).

5

distributed to administrative, priority, secured, and unsecured creditors—"is not less than the projected disposable income of the debtor. . . ."

The Objectant's argument is simply wrong when it contends that the phrase "property to be distributed under the plan" in § 1129(a)(15)(B) means "property to be distributed under the plan to unsecured creditors." *Objection*, at 6 (emphasis in original). As the Supreme Court has held, it is a court's "duty to refrain from reading a phrase into the statute when Congress has left it out." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993). Moreover, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citing *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)); *Moreno-Bravo v. Gonzales*, 463 F.3d 253, 261 (2d Cir. 2006).

There is no reason to read into § 1129(a)(15)(B) the requirement that an individual debtor must pay *unsecured creditors* his or her projected disposable income, and there is every reason not to do so. Section 1129(a)(15) is one subsection of a provision that sets forth a series of requirements that every chapter 11 plan must satisfy—for example, that administrative and most priority creditors be paid in full unless they agree otherwise. *See* 11 U.S.C. § 1129(a)(9). There is no minimum payment that must be made to unsecured creditors unless the plan is rejected by a more senior class.[2] A requirement that property of a certain value be paid to unsecured creditors is entirely foreign to this scheme.

---

[2] There is some question whether the absolute priority rule applies at all in an individual chapter 11 case. *Compare In re Lively*, 717 F.3d 406, 407 (5th Cir. 2013) (holding absolute priority rule applies in an individual chapter 11 case); *In re Stephens,* 704 F.3d 1279, 1286–87 (10th Cir. 2013) (same); *In re Maharaj*, 681 F.3d 558, 568–70 (4th Cir. 2012) (same); *with Friedman v. P + P, LLC (In re Friedman)*, 466 B.R. 471, 482 (B.A.P. 9th Cir. 2012) ("A plain reading of §§ 1129(b)(2)(B)(ii) and 1115 together mandates that the absolute priority rule is not applicable in individual chapter 11 debtor cases."). This issue need not be decided here.

Not surprisingly, the courts that have considered this issue have uniformly held that § 1129(a)(15)(B) does not require an individual debtor to pay an amount at least equal to his or her projected disposable income to unsecured creditors. *See In re Gbadebo*, 431 B.R. 222, 226 (Bankr. N.D. Cal. 2010) ("The Debtor correctly notes that [§ 1129(a)(15)(B)'s] requirement goes to the amount paid to all creditors under the Plan, not just to the Class 8 creditors or just to the creditor who objects to the plan."); *In re Gordon*, 465 B.R. 683, 693 fn. 8 (Bankr. N.D. Ga. 2012) ("11 U.S.C. § 1129(a)(15) only requires the amount of projected disposable income equal the 'value of the property to be transferred under the plan' to all creditors, not just unsecured creditors. Compare 11 U.S.C. § 1325(b)(1)(B)."); *In re Ekstrom*, 08-07750-SSC, 2010 WL 1254893, *7, 18 (Bankr. D. Ariz. Mar. 23, 2010) (holding that an individual debtor satisfied § 1129(a)(15) because "the value of the property to be distributed under the plan is not less than the projected disposable income of the Debtor during the period for which the plan provides payments", even though most of the debtor's plan payments went toward reducing his substantial tax obligations). Instead, § 1129(a)(15)(B) requires that the total value of *all* property distributed in a plan must be equal to or greater than the debtor's projected disposable income.

**Calculation of Projected Disposable Income**

Most of the parties' argument in this matter has centered on the calculation of the Debtors' projected disposable income. The Debtors and the Committee use a very simple formula often used as a rule of thumb in chapter 13 cases. Thus, § 1325(b)(2) defines "disposable income" in pertinent part as "current monthly income received by the debtor " minus various expenses and with certain exclusions. 11 U.S.C. § 1325(b)(2). Based on the Debtors' income and expenses for the six months prior to the petition, the Debtors calculate their disposable income at $156.68 per month, which equates to a projected disposable income of $9,400.80 over five years.

7

*Debtors' Response*, at 3. The Debtors argue that "[t]he record before the Court is replete with facts that are known or virtually certain from which the Court can conclude that the Debtors' projected disposable income is $9,800.80." *Id.* at 4.[3]

The Objectant argues with some force that this formula ignores *Hamilton v. Lanning*, 560 U.S. 505 (2010), where the Supreme Court held that in calculating "projected disposable income" in a chapter 13 case, courts should employ a "forward-looking" approach, first calculating disposable income, and then in unusual cases taking into account other known or virtually certain information about the debtor's future income or expenses. The Objectant argues that the Plan miscalculates projected disposable income by ignoring all of the proceeds from the Trust earmarked for the Debtors and by grossly underestimating Mr. Pfeifer's earning capacity. At least one bankruptcy court has applied *Hamilton*'s "forward-looking" approach in calculating an individual chapter 11 debtor's "projected disposable income." *See Gordon*, 465 B.R. at 688–89.

The short answer to the Objectant's argument is that it does not matter whether projected disposable income is calculated in the manner propounded by the Debtors/Committee or by the Objectant. The Debtors' calculation of their projected disposable income over five years is $9,400.80. Even assuming that the Objection is correct and (i) Mr. Pfeifer would be able to earn $300,000/year from his law practice for each of the next five years; (ii) the length of the Debtors' Plan is the length of the Trust; (iii) the income he anticipates as possibly receivable from Trust assets[4] should be included in the Debtors' disposable income; and (iv) the Debtors incorrectly

---

[3] The Court assumes that the Debtors meant to state their projected disposable income as $9,400.80, as they did on the previous page of their Response, instead of $9,800.80.

[4] Estimated by the Debtors to be $284,350, which includes (i) $100,000 from the *Cronin* Adversary; (ii) $110,000 from the sale of Unit 8K; (iii) $39,150, equal to half of the estimated legal fee receivables pledged to Pre-Settlement Finance, per the Debtors' agreement with Pre-Settlement Finance; and (iv) $35,200 from the other legal fee receivables not pledged to Pre-Settlement Finance. *See Disc. Statement*, Exh. 4.

8

deducted as an expense in the calculation their liability for professional fees in this case,[5] the Debtors' Plan would still distribute property with a value equal to or greater than the Debtors' projected disposable income. The reason is that a conservative estimate of the value of the property to be distributed in the Debtors' Plan—including distributions on administrative claims, priority tax claims, secured claims, priority non-tax claims, and general unsecured claims—is approximately $3.5 million.[6]

For example, if the Debtors' projected disposable income is recalculated as Objectant suggests to include an income for Mr. Pfeifer of $300,000 per year over the next five years,[7] $284,350 in receipts from Trust assets, twenty years' worth of the Debtors' current yearly

---

[5] Estimated by the Debtors to be $135,000. *See Disc. Statement*, at 15.

[6] This amount is based on estimated claims and the estimated recovery on these claims. *See Disc. Statement*, at 5 and Exh. 4. The $3.5 million amount was arrived at by adding all of the estimated recoveries for each claim as outlined below (except for Pre-Settlement Finance's claim and the General Unsecured Claims because they may not receive any distribution) and then reducing this amount by approximately $500,000 to account for the possibility that E.R. Holdings, LLC and Hudson Valley Bank may receive a deficiency claim if the net sale proceeds are insufficient to satisfy their secured claims that would be treated as a General Unsecured Claim. The relevant portions of the chart that is included on page 5 of the Debtors' Disclosure Statement is reproduced below:

| Class | Description | Estimated Claim | Estimated Recovery |
|---|---|---|---|
| N/A | Admin Claims | $603,000 | 100% |
| N/A | Priority Tax Claims | $20,798 | 100% |
| 1 | Secured Tax Claims | $71,418 | 100% |
| 2 | Priority Non-Tax Claims | $48,879 | 100% |
| 3 | Secured Claim of Ridgewood Savings Bank (Unit 8J) | $211,819 | 100% |
| 4A | Secured Claim of E.R. Holdings, LLC (Bronx Property) | $1,502,000 | Up to 100% |
| 4B | Secured Claim of Hudson Valley Bank (Bronx Property) | $877,458 | Up to 100% |
| 4C | Secured Claim of New York Community Bank (Unit 8K) | $190,777 | 100% |
| 4D | Secured Claim of NCB, FSB (Unit 8F) | $191,667 | 100% |
| 4E | Secured Claim of Pre-Settlement Finance (Legal Fees) | $139,767 | TBD |
| 4F | Other Secured Claims | $205,418 | Up to 100% |
| 5 | General Unsecured Claims | $1,782,165–$2,725,039 | Up to 28.99% |

[7] Objectant argues that "[i]t is 'known or virtually certain', based on Debtors' own projections and Max's work and income history, that Mr. Pfeifer will receive, sign up, and refer new cases over the next five (5) years. . . ." *Objection*, at 14. As the Debtors point out, this would require Mr. Pfeifer to continue working at the same profitability level achieved two years ago until he is 91, despite the fact that his health is deteriorating, and it is his intent to wind down his practice over the next six months and to sell the property where he works. *See Disc. Statement*, at 8.

9

disposable income ($37,603.20),[8] and if $135,000 in professional fees is not included as an expense—which essentially increases projected disposable income by $135,000—the Debtors' projected disposable income would still be slightly less than $2 million.[9] This amount is much less than the approximate $3.5 million the Debtors will distribute in their Plan. The Objection is thus overruled because even assuming Objectant is correct in each of its assertions and the Debtors' projected disposable income must be increased accordingly, the Debtors' Plan still distributes property whose value is greater than their assumed projected disposable income, and it satisfies § 1129(a)(15)(B).

**Feasibility**

Although Objectant did not object on the basis that the Debtors' Plan is not feasible, "[i]n considering confirmation of a plan of reorganization, a court has an affirmative obligation to scrutinize the plan and determine whether it is feasible." *In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010); *In re Las Vegas Monorail Co.*, 462 B.R. 795, 798 (Bankr. D. Nev. 2011) (quoting 7 COLLIER ON BANKRUPTCY ¶ 1129.05[1][e] (Henry Sommer & Alan Resnick, eds., 16th ed. 2011) ("'The court has a mandatory, independent duty to review plans and ensure they comply with the requirements of section 1129.... The judge's independent duty will come into play often with respect to the feasibility requirement.'"). In this case the Debtors are relying on the proceeds from the *Cronin* Adversary as the principal means of paying a projected $468,159 tax liability. *See Plan*, at 12. The liability apparently arises out of the disposition of a Florida property in which Mr. Pfeifer was an investor. The disposition took place

---

[8] Twenty years is used as an example to show that even if the Court held that the Plan's term would equal the length of the Trust, the Trust would have to long outlive the Debtors for the Debtors' projected disposable income to be greater than the amount of property distributed in the Plan.
[9] It should be clear that the Court is not finding that $2 million is the Debtors' projected disposable income or that any of these amounts are "known or virtually certain" as required by the "forward-looking" approach used in *Hamilton* to calculate projected disposable income.

post-petition, and the status and even the amount of the liability is not certain. Nevertheless, since the Plan assumes it will be payable in the stated amount, the Court will examine whether the Debtors would be able to pay such a large tax claim even if they do not receive sufficient proceeds from the *Cronin* Adversary.

The feasibility standard examines "whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re DBSD N. Am., Inc.*, 634 F.3d 79, 106–07 (2d Cir. 2011). "The key element of feasibility is whether there exists the reasonable probability that the provisions of the Plan can be performed." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

Here, if the *Cronin* Adversary is unsuccessful, the Debtors will have to rely on proceeds received from the Trust to pay the assumed $468,159 tax liability. As discussed above, the Plan provides that unsecured creditors will only receive payment from the Trust "after the Post-Confirmation Trustee has reserved any Cash required to pay Claims that are senior in priority. . . ." *Plan*, at 12. As a likely priority or possibly an administrative expense, the tax liability is senior in priority to unsecured creditors. Based on the estimated Schedule of Estate Assets included as Exhibit 4 to the Disclosure Statement, the Trust will distribute to unsecured creditors $286,013.74, excluding the proceeds from the *Cronin* Adversary.[10] In addition, the Debtors anticipate receiving $184,350 from the Trust without considering the $100,000 in proceeds from the *Cronin* Adversary.[11] Thus, the Trust is estimated to distribute $470,363.74 to

---

[10] This amount includes (i) $43,379.21 from the sale of Unit 8K; (ii) $105,834.53 from the sale of the Bronx Property; and (iii) $136,800 from the legal fee receivables. *See Disc. Statement*, Exh. 4.
[11] This amount includes (i) $110,000 from the sale of Unit 8K; (ii) $39,150, equal to half of the estimated legal fee receivables pledged to Pre-Settlement Finance, per the Debtors' agreement with Pre-Settlement Finance; and (iii) $35,200 from the legal fee receivables not pledged to Pre-Settlement Finance. *See Disc. Statement*, Exh. 4.

the Debtors and unsecured creditors combined, which could be used to pay in full the $468,159 tax liability in the event the Debtors do not recover any money from the *Cronin* Adversary.

If the Debtors do not achieve a recovery from the *Cronin* Adversary, their projected cash flow would be negatively impacted because they would not receive $100,000 from the *Cronin* Adversary, and they might have to use all of the money projected to be received from the Trust to pay the tax liability. *See Disc. Statement* Exh. 4. According to the Debtors' 12-month projections also attached as Exhibit 4 to the Disclosure Statement, this would reduce the Debtors' ending cash balance after 12 months by $284,350, but it would still leave the Debtors with $67,639 in cash on hand at the end of that period. *Id.* Thus, based on the Debtors' projections in their Disclosure Statement, they would be able to pay their $468,159 tax liability from the Trust's proceeds. The Debtors would also be able to make their other Plan payments and continue to have some cash reserves 12 months into their Plan. Therefore, the Debtors' Plan satisfies § 1129(a)(11) because there is a reasonable probability that the provisions of the Plan can be performed.

## CONCLUSION

For the reasons set forth above, the Objection is overruled. The Debtors' Plan satisfies § 1129(a)(15) because it distributes property to creditors with a value equal to or greater than their projected disposable income, even under Objectant's assumptions. The Debtors' Plan also satisfies § 1129(a)(11)'s feasibility requirement. The Court will enter an appropriate confirmation order concurrently herewith.

Dated: October 18, 2013
      New York, New York

                                      **s/Allan L. Gropper**
                                      UNITED STATES BANKRUPTCY JUDGE